The Clay Brothers Drilling Company, Inc. v. Commissioner.
Clay Bros. Drilling Co. v. Commissioner
Docket No. 108312.
United States Tax Court
1943 Tax Ct. Memo LEXIS 483; 1 T.C.M. (CCH) 472; T.C.M. (RIA) 43046; January 28, 1943
*483 George B. Collins, Esq., and Elmer E. Fox, C.P.A., 207 Fourth Nat'l Bank Bldg., Wichita, Kans., for the petitioner. John E. Marshall, Esq., for the respondent. SMITH Memorandum Findings of Fact and Opinion SMITH, Judge: This proceeding is for redetermination of deficiencies in income tax and excess profits tax for the fiscal year ended March 31, 1938, of $28,610.85 and $9,548.81, respectively. The petitioner has waived one of the allegations of error stated in the petition. The questions in issue are whether the petitioner is entitled to deduct from gross income of the taxable year (1) $50,000 representing a sum allegedly paid to Walter F. Kuhn and Howard Kuhn for drilling contracts; (2) $20,000 representing a sum paid to the Bridgeport Machine Co. during the taxable year; and (3) whether the respondent erred in failing to allow a dividends paid credit of $10,000 representing dividends declared and made available to the stockholders during the taxable year. The respondent concedes the third issue. Findings of Fact The petitioner was incorporated under the laws of the State of Kansas on April 16, 1937. It has its principal office at Wichita and filed its corporation income and *484 excess profits tax return for the fiscal year ended March 31, 1938, with the collector of internal revenue for the district of Kansas. It was incorporated under the name of the Kuhn Brothers Drilling Company, Inc. Its corporate name was changed to its present form on or about August 4, 1939. Prior to the formation of the petitioner corporation Walter F. Kuhn and Howard Kuhn, brothers, were engaged in the business of drilling under contract oil and gas wells in Stevens County, Kansas. This was in what is known as the Hugoton area and within the "dust bowl." Walter F. Kuhn was suffering from a bad case of asthma which was aggravated by the dust and heat and both brothers were anxious to dispose of their business and move to a more healthful region. In the early part of 1937 the Kuhn brothers offered to sell their drilling equipment and supplies to The Bridgeport Machine Co., which was a dealer in gas and oil well machinery and supplies, at a price of $60,000. The president of the company, A. A. Buschow, was not interested. He told them that they "thought too much of the equipment, and said it was $10,000 or $15,000 too high at $60,000." Soon thereafter the Kuhn brothers were low bidders *485 on contracts for the drilling of 13 gas wells in the Hugoton area. It appeared that these contracts would prove very profitable and when Buschow learned that they had the contracts he told them that he might be able to find a purchaser for the equipment with the contracts. He called to his office R. G. Clay and presented the proposition to him. R. G. Clay and his brother, W. J. Clay, were experienced contractors in the drilling of gas and oil wells in Texas but they had had no experience in drilling gas wells in the Hugoton area. They also were without tools or capital. R. G. Clay inspected the drilling tools and equipment owned by the Kuhn brothers, consisting principally of three rotary rigs and a spudder, and determined that they had a value of about $50,000. He was furthermore of the opinion that the contracts for the drilling of the 13 gas wells were very valuable. After some negotiations the Clay Brothers on March 10, 1937, entered into an agreement with the Kuhn brothers for the purchase of all the drilling equipment and supplies owned and being used by them in their drilling operations. By the terms of this agreement the buyers obligated themselves to pay the sellers $110,000 *486 for the drilling tools and equipment subject to many stipulations, terms and conditions, among which were that the sellers should turn over to the buyers all of the benefits of the 13 contracts which the sellers owned together with seven additional contracts equally promising which the sellers were to obtain. The buyers were to make an initial cash payment of $10,000 and pay to the Kuhn brothers $2,000 additional upon the completion of each of the first 10 wells and $3,000 upon the completion of each of the remaining 10 wells. For any unpaid balance of the purchase price remaining after the completion of the 20 wells which it was provided should all be completed within a twelve-months' period, the buyers were to pay interest at six percent per annum and Walter F. Kuhn agreed to secure additional contracts for the drilling of gas wells which should be equally as profitable as the contracts for the drilling of the 20 wells for which the petitioner was to pay him a commission of $500 on each well so long as the buyers should operate under the name of The Kuhn Brothers Drilling Co.
The purchase contract further provided: IV. It is further understood that should Buyers at any time find *487 that, because of conditions out of Buyers' control, such as strikes, increased expenses, increased labor costs or material costs, such drilling operations cannot be handled on an equally profitable basis as under the present and prevailing conditions, then said Sellers agree to adjust these conditions by either reducing the amount of the installments herein provided or by providing for an increase in the price received for such drilling, to a basis satisfactory with Buyers and equal to the conditions prevailing at this time; V. At the time when Buyers shall start drilling operations under this Contract, the Sellers agree to work with them in helping to direct drilling operations, to advise with them and to give Buyers the benefit of Sellers' previous and past experience in connection with drilling conditions in the Hugoton, Kansas area, until such time as the Buyers sufficiently understand the conditions in that territory, in order to operate profitably. VI. It is agreed by the parties hereto that said Buyers shall, for the purpose of carrying on such drilling operations, form a corporation, the name of which corporation shall be The Kuhn Brothers Drilling Company, which Company *488 shall operate the drilling rigs and drill and complete said wells under the direct supervision and sole management of the said Buyers, who shall direct the policies of said Company and control its operations in their entirety; also, it is agreed that the said Corporation, as soon as properly organized, shall take the place of the individual Buyers mentioned herein, and shall perform and act in every way in carrying out this Agreement, and the terms, covenants and conditions herein contained. (a) Walter F. Kuhn and Howard Kuhn, hereinabove referred to as Sellers, hereby agree that they each will subscribe for ten (10) shares of the capital stock of said Corporation, and that they will accept the positions and act as Directors, and also as President and Vice-President, respectively, of said Corporation, subject to the desire and control of the said Buyers. VII. It is agreed by the said Buyers that Sellers may have the use of one rotary drilling rig out of this equipment, for purposes of completing three (3) certain wells in the development of Sellers' property, and it is agreed that Sellers shall use such rig at their own risk and expense and shall pay for any damages incurred by *489 such use and replace any parts or equipment, if it is found necessary at the time when such drilling rig and equipment is returned to Buyers under this contract, and the use of such drilling rig and equipment shall not exceed a period of ninety (90) days from the date of this Contract. Nor shall the use of said rig by Sellers be allowed to interfere with the drilling of any well or wells by Buyers, on which the use of said rig may be necessary. It was further provided: * * * at the time when the full amount of said $110,000.00, covering purchase price of drilling rigs, machinery and equipment hereinabove mentioned, has been paid by Buyers to Sellers, as herein provided, then at that time said equipment in its entirety shall become the property of the Buyers. * * * The purchase contract of March 10, 1937, was supplemented by an agreement between the parties dated April 3, 1937, which provided that in case the sellers were for any reason unable to furnish the full amount of 20 well-drilling contracts "the Sellers agree to penalize themselves $3,000.00 and pay to Clay Brothers the said $3,000.00 in cash for each drilling contract they fail to provide, within the periods of time, and *490 satisfactory to Buyers, as provided for in said contract." Under date of April 6, 1937, the Clay brothers entered into a contract with The Bridgeport Machine Co. by which it agreed to advance to Clay brothers $10,000 with which they were to make the initial payment to Kuhn brothers required by the agreement of March 10, 1937. The Bridgeport Machine Co. further obligated itself to advance to Clay brothers such amounts as might be necessary for them to have in carrying on drilling operations. The Clay brothers on their part agreed to turn over to The Bridgeport Machine Co. all amounts received by them upon the completion of each well. The Bridgeport Machine Co. was to disburse the funds as per the contract. It was to reimburse itself for all monies advanced to Clay brothers. The contract provided: * * * and said Bridgeport, as such money is received from time to time from Clay brothers shall apply it in reduction of any indebtedness owed by Clay Brothers to Bridgeport (subject to the terms and conditions herein set out) until such time as all of said indebtedness, together with interest thereon at the rate of 6% per annum, as herein provided, has been fully and completely paid * * *491 * The Bridgeport Machine Co. was to save out $1,000 on each of the first 10 wells to reimburse itself for the initial advance of $10,000. The contract further provided that The Bridgeport Machine Co. should receive, in addition to the repayment of loans with interest, a commission of $2,000 per well for each of the 20 wells to be completed, or a total commission of $40,000. This was to compensate it for its services in bringing the Clay brothers and the Kuhn brothers together and for its risk in advancing capital to Clay brothers for the drilling of the wells. The petitioner corporation was organized pursuant to the terms of the purchase contract of March 10, 1937, under the name of The Kuhn Brothers Drilling Company. Contracts for the drilling of 20 wells in the Hugoton area were furnished by Walter Kuhn and Howard Kuhn as agreed and the drilling of the 20 wells was completed by the petitioner during the fiscal year ended March 31, 1938. Payment of $84,000 was made to the two Kuhn brothers under the contract during the year leaving a balance of $26,000 still payable to them. Under date of October 11, 1937, the 20 wells contracted for having been completed The Bridgeport Machine *492 Co. agreed to accept in lieu of the $40,000 provided for by its agreement with Clay brothers the amount of $20,000 "as full settlement and consideration in lieu of the amount stipulated in Paragraph V-3, of the above-mentioned contract [March 10, 1937], and both parties hereby agree that the above contracts are cancelled." The Clay brothers agreed, in consideration of the above, to "purchase their future material and supply requirements from The Bridgeport Machine Company, payment for such material and supplies to be made at the completion of each well." The petitioner's books of account show the cost of the drilling equipment and supplies acquired from Kuhn brothers as $50,000. The 20 contracts likewise acquired from them were shown as having cost $60,000. In its income tax return for the fiscal year ended March 31, 1938, the payments aggregating $60,000 to Kuhn brothers for the drilling contracts and $30,000 paid to The Bridgeport Machine Co. were claimed as deduction from gross income. These deductions were disallowed by the respondent in the determination of the deficiencies. Opinion The question presented is the right of the petitioner to deduct from its gross income for *493 the taxable year ended March 31, 1938, (1) $60,000 which the petitioner claims to have paid to Kuhn brothers for 20 drilling contracts which were completed within the taxable year, and (2) $20,000 paid as commission to The Bridgeport Machine Co. for financing the petitioner in carrying out the 20 contracts. The respondent has disallowed the deduction of the above amounts for reasons stated in the deficiency notice as follows: (a) You claimed as a deduction on the return the amount of $60,000.00, represented to be a bonus paid to Waiter and Howard Kuhn for guaranteeing delivery of certain drilling contracts. Of the amount so claimed, $50,000.00 is disallowed as not representing an allowable deduction for income tax purposes. (b) The deduction of $20,000.00 claimed on the return as a bonus paid to Bridgeport Machine Company is disallowed. It is held that no part of the amount claimed constitutes an allowable deduction. In his brief the respondent contends that the above-referred to amounts are not legal deductions from gross income because they are capital expenditures or in the nature of capital expenditures. It is his contention that Clay brothers acquired from Kuhn brothers a going *494 business, the consideration for which was the payment of $110,000 and that that $110,000 is not separable into two amounts, one representig $50,000 paid for tangibles, and the other, $60,000, paid for the contracts. He further contends that the $20,000 paid to The Bridgeport Machine Co. also represents a part of the cost of the business and that it is in no sense an ordinary and necessary expense of carrying on a trade or business. We consider first the question of the deduction of the $20,000 item. This amount was paid pursuant to the provisions of the contract of April 6, 1937, between the Clay brothers and The Bridgeport Machine Co. The amount was paid pursuant to the following provisions of the contract: Third: (a) As commission for relinquishing its rights in, and turning over such drilling contracts and rotary drilling rig purchase negotiations to said Clay Brothers; (b) for the risks taken by said Bridgeport in connection with this transaction; (c) for furnishing the hereinabove-mentioned $10,000.00 to be used as the initial payment on the purchase price of said rotary drilling tools and equipment; (d) for financing in a general way, and making certain other advancements *495 to take care of labor, and other expenses incident to such drilling operations, (all subject to the terms and conditions herein provided for), the said Bridgeport in consideration for such services rendered (as enumerated in this paragraph) shall retain, and be paid, from such funds, so collected by Clay Brothers and turned over to Bridgeport, as a result of such drilling and from the proceeds thereof, $2,000.00 per well from the first twenty (20) wells drilled and completed by said Clay Brothers, (making a total of $40,000.00). Although Clay brothers obligated themselves to pay The Bridgeport Machine Co. $40,000.00 for its financing of the 20 contracts, this obligation was satisfied, as shown by our findings of fact, by the payment of $20,000. At the hearing of this proceeding counsel for the respondent suggested that $20,000 was an unreasonable amount to pay as commission for the financing of the drilling of the 20 wells. It is to be noted, however, that Clay brothers did not invest a dollar in the whole undertaking. They were simply to perform personal services. The contracts were all completed during the taxable year. The Bridgeport Machine Co. had earned its commission. In our *496 opinion the petitioner is entitled to the deduction of the $20,000 paid to The Bridgeport Machine Co. as an ordinary and necessary expense. Relative to the deduction of the $60,000 paid to Kuhn brothers we think it is quite apparent that it was not paid for any good will or for any drilling contracting business as such. Howard Kuhn testified that there were several drilling contractors in the Hugoton area; that when any company wished a gas well drilled it got the estimates of the several drillers. In every instance the drilling contract was awarded to the lowest bidder. The profits which might be made to indicate that Kuhn brothers had any advantage over other drilling contractors in obtaining contracts. It was testified that drilling contracts were not negotiable. Kuhn brothers obtained drilling contracts for the drilling of 20 wells. They were responsible for the completion of the wells. Under the purchase contract of March 10, 1937, Clay brothers were to organize a corporation, the name of which was to be The Kuhn Brothers Drilling Company. There is no evidence, however, that any value attached to that name and it is significant that on August 4, 1939, the name of the company *497 was changed to its present name. There is nothing to show that the business had a good will value. It is also to be noted that Kuhn Brothers offered their equipment and business for sale in the early part of 1937 at a price of $60,000 and that A. B. Buschow, president of The Bridgeport Machine Co. thought that that price was $10,000 or $15,000 too high. It was only after Kuhn brothers obtained contracts for the drilling of 13 wells, which promised a large profit, that Buschow attempted to find a purchaser for Kuhn brothers' business. Under the purchase contract Kuhn brothers were to receive a down payment of $10,000 and $2,000 upon the completion of each of the first 10 wells and $3,000 upon the completion of each of the last 10 wells. This makes a total of $60,000. It was also provided in the supplemental agreement of April 3, 1937, that if for any reason Kuhn brothers did not obtain the additional seven contracts they were to be penalized $3,000 for each contract that they failed to furnish. This indicates quite clearly that the value put upon each well-drilling contract was $3,000 and this is evidenced by the fact that the contracts were placed upon the petitioner's books of account *498 at a value of $60,000. Long before the close of the taxable year the petitioner had completed its contracts for the drilling of 20 gas wells and been paid for them. They no longer had a value to the petitioner. The petitioner's book asset of $60,000 for the contracts was wiped out. The cost of shortterm contracts which have been fully completed within the taxable year are legal deductions from gross income as ordinary and necessary expense. Commissioner v. Pittsburgh Athletic Co. (C.C.A., 3rd Cir.), 72 Fed. (2d) 883. In the light of these facts we think it was perfectly proper for the petitioner to claim the deduction from its gross income for the taxable year of the $60,000 paid for the contracts for the drilling of the 20 wells. Decision will be entered under Rule 50.